<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARK AROMANDO,<br><br>        Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>        Defendant. | Case No.:  2:16-cv-08174 (PAZ)<br><br>**OPINION** |

**APPEARANCES:**

KARL A. KAZMIERCZAK
KAZMIERCZAK & KAZMIERCZAK LLP
593 RAMAPO VALLEY ROAD
OAKLAND, NJ  07436
    On behalf of Plaintiff

EVELYN ROSE MARIE PROTANO
SPECIAL ASSISTANT U.S. ATTORNEY
C/O SOCIAL SECURITY ADMINISTRATION
OFFICE OF GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA  19101
    On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Mark Aromando for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.). Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes

Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On December 26, 2011, Plaintiff filed an application for DIB alleging a disability onset date of April 1, 2009.  (R. 173-79.)[2]  On April 30, 2012, the Commissioner determined that Plaintiff was not disabled and denied the application.  (R. 148-52.)  Plaintiff filed for reconsideration, and his application was again denied on December 4, 2012.  (R. 153-55.)  On October 31, 2013, an Administrative Law Judge held a hearing on Plaintiff's application at which Plaintiff was represented by counsel.  (R. 48-107.)  On June 6, 2014, the ALJ issued a decision denying Plaintiff's application.  (R. 31-47.)  On July 6, 2015, the Appeals Council denied Plaintiff's request for review (R. 8-13), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On November 2, 2016, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On June 22, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018).  However, Ms. Berryhill continues to functionally lead the Social Security Administration from her position of record as Deputy Commissioner of Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this suit.

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 7.

§ 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 17.[3] The case was reassigned to the undersigned Magistrate Judge on June 28, 2018.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018). Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g., Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000));

4

*see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984)). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed

and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B. **Standard for Awarding Benefits**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 404.1505(a). An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id*. § 404.1521.

The process for determining an adult's claim for DIB involves a five-step sequential inquiry. 20 C.F.R. § 404.1520(a)(4).[4] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id*. § 404.1512; *see Holley v. Colvin*,

---

[4] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit. *Id*. §§ 404.1572(a) & (b). If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). At this step, the ALJ decides whether the claimant has an impairment or a combination of such impairments that is severe. 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities. An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. *Id*. § 404.1522. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If the claimant's specific impairment is not listed, the ALJ

will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id*. § 404.1526(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. § 404.1509.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id*. §§ 404.1560, 404.1565. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as

exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  20 C.F.R. §§ 404.1569a(a) & (b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching.  *Id*. § 404.1569a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2.  20 C.F.R. § 404.1569a(b).  The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination.  If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations.  *Id*. § 404.1569a(d).  If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making.  *Id*. § 404.1569a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty years old on the alleged onset date (April 1, 2009), and the date last insured was December 31, 2014.  (R. 34, 36, 41.)  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (R. 36.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments:  somatoform disorder, depression

and paranoia, status post bunion surgery, and reflex sympathetic dystrophy.[5] (R. 36.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were sever enough to meet or medically equal the severity of any Listing. (R. 36.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work subject to various exertional and non-exertional limitations. (R. 37.) The ALJ also found at Step Four that Plaintiff was not able to perform any past relevant work. (R. 20.) At Step Five, the ALJ found that a finding of not disabled would be directed by the Grid Rules if Plaintiff had the RFC to perform the full range of sedentary work. (R. 41.) The ALJ also found at Step Five that certain jobs – food and beverage clerk, eyeglass polisher, and envelope addresser – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 41.) The ALJ concluded that Plaintiff was not disabled at any time between the alleged onset date and the decision date. (R. 42.)

Plaintiff contends that the RFC finding at Step Four is not supported by substantial evidence because the ALJ erroneously weighed the medical opinion evidence and erroneously assessed Plaintiff's subjective symptoms. Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

---

[5] Complex regional pain syndrome (CRPS) is a chronic pain condition that most often affects one limb, usually after an injury. CRPS is believed to be caused by damage to, or malfunction of, the peripheral and central nervous systems. Individuals without a confirmed nerve injury are classified as having CRPS-I, which was previously known as reflex sympathetic dystrophy (RSD). *See* https://www.ninds.nih.gov/ Disorders/Patient-Caregiver-Education/Fact-Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet.

## IV.    RELEVANT MEDICAL EVIDENCE

The extensive medical evidence in this case is needlessly complicated by the fact that many exhibit descriptions are inaccurate and/or do not reflect that a single exhibit contains materials from multiple providers.    Neither party's brief cites to the medical evidence with enough specificity for the Court properly to apply the substantial evidence standard of review, so the Court was required to expend significant additional resources to prepare the following summary and decide the case.

### A.    Submitted To ALJ.

#### 1.    Treating Providers.

Dr. Joseph M. DeMayo (family medicine), Plaintiff's primary care physician since 1994, summarized Plaintiff's relevant medical history in an undated letter to the State Agency (file-stamped February 11, 2012).[6]  In 1994, Plaintiff underwent a bilateral bunionectomy.[7]  Plaintiff thereafter repeatedly complained about pain in both feet – with the left foot being the worst.  In 2001, Plaintiff was diagnosed with reflex sympathetic dystrophy (RSD) of both feet.  In 2005, metallic pieces from Plaintiff's bunionectomy were discovered in Plaintiff's left foot.  In 2007, Plaintiff suffered a work-related left ankle injury and, during surgery in 2008 to repair the ankle, also had the metallic pieces removed from his foot.  On April 1, 2009, following 8 months of physical therapy, Plaintiff retired on a permanent disability pension.  Dr. DeMayo concluded:

> It is in my Medical Opinion that [Plaintiff] is neurologically and orthopedically disabled and does meet the criteria to receive Social Security Disability Benefits. Specifically he is unable to stand, sit or walk for any prolonged period of time and has limited range of motion.  Furthermore [Plaintiff] started treating with Dr. Feder to try to help with his depression/anxiety.

---

[6] Dr. DeMayo submitted treatment records for the period between March 2005 and September 2013.  (R. 274-75, 293-383, 395-98, 532-45.)

[7] Dr. Anthony Borrelli (podiatric surgeon) submitted an operative report dated October 4, 1994 for bilateral Austin bunionectomies with Kirschner wire fixation.  (R. 546-47.)

(R. 393.) Dr. DeMayo also submitted a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) dated February 25, 2012, opining that Plaintiff: could occasionally lift/carry up to, but never more than, 10 pounds; could not walk 1 block at a reasonable pace on rough or uneven surfaces; could stand or walk for 20 minutes without interruption for a total of 2 hours each in an 8-hour workday; could sit for 2 hours without interruption for a total of 2 hours in an 8-hour workday; needed to elevate his leg, take his medication, and keep his legs warm during the remaining hours of an 8-hour workday; could frequently reach or handle/finger/feel with his fingers and hands, but never push/pull with his arms; could occasionally operate foot controls, climb stairs/ramps, stoop, balance, or crouch; could never climb ladders/scaffolds, kneel, or crawl; could occasionally operate a motor vehicle or tolerate exposure to humidity and wetness; and could never tolerate exposure to unprotected heights, moving mechanical parts, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations. Dr. DeMayo noted that Plaintiff's medications made him drowsy and lethargic, and that Plaintiff also suffered from anxiety and depression due to his medical history. (R. 399-404.)

Dr. Michael M. Brand (neurologist) evaluated Plaintiff twice in 2001 and once in 2004. (R. 548-51.) In June 2001, physical examination findings included dysesthesia to touch with burning and tingling involving the dorsum of both feet, extending to the upper aspect of the inner arches. Electrodiagnostic study results were within normal limits. In a letter to Dr. DeMayo dated July 12, 2001, Dr. Brand stated that a trial of Neurontin had been discontinued after Plaintiff developed nausea and lightheadedness. Dr. Brand opined that Plaintiff's symptoms were consistent with an RSD diagnosis for which no "specific therapeutic modality" existed. Dr. Brand suggested that Dr. DeMayo consider a trial of Tegretol and send Plaintiff for a vascular consultation (including Doppler venous and arterial studies of the lower extremities) to establish

the patency and adequacy of Plaintiff's peripheral circulation. In March 2004, Dr. Brand opined

that Plaintiff's development of redness in both feet and continued sensory issues indicated that the

RSD had progressed since June 2001.

In March 2005, Dr. John Cozzarelli (podiatric surgeon) prepared an MRI report of

Plaintiff's left foot revealing the presence of the metallic foreign bodies. (R. 552.)

In March 2008, Dr. Paul Kovatis (orthopedic surgeon) operated on Plaintiff's left ankle

and foot. The operative report reads in part:

> I [Dr. Kovatis] initially met this gentleman when he was having recalcitrant pain
> and numbness in his great toe following a podiatric bunionectomy several years
> ago relating to another work related issue. I did not do that surgery; this was done
> by someone else. The plan several years ago was to address his first metatarsal
> phalangeal joint pathology but the patient's personal problems prevented this from
> occurring. He was then lost to follow-up and recently sustained a rotational type
> of ankle injury resulting in chronic ligamentous pain and instability as well as
> continuation of his great toe pain. He initially was seen by Dr. Michael Gross, a
> local orthopedic surgeon, and was sent for independent medical examination done
> by Dr. Arthur Canario. When I met this patient in my office, we reviewed his entire
> orthopedic situation and the patient expressed a desire to address not only the
> chronic ankle problem but the chronic foot problem. This would involve
> exploration of the first metatarsal phalangeal joint and removal of the retained
> foreign bodies, most likely metallic fragments from the bunionectomy. The ankle
> reconstruction would include repair of the ligaments and an examination of the joint
> to remove the anticipated and typical arthrofibrotic scarring and hemorrhagic
> synovitis seen with chronic ankle sprains. … *I made it clear to the patient that I*
> *cannot, repeat cannot, guarantee compete amelioration of his pain. Revision*
> *surgery in the face of scarring, esp. in the foot and toes, is prone to worsening*
> *numbness and he was told to weigh this concept against enduring the current*
> *symptoms. He remains focused on his great toe pain for which I make no*
> *guarantees with respect to resolution.* He also requested that I personally give him
> the metallic fragments that are embedded in his soft tissues. I made it clear to this
> patient that this is impossible as they need to be logged in the pathology department
> as well as the fact that they are very small and they may be embedded in the tissues.
> I cannot, repeat cannot, guarantee that all of them will be retrieved. I will do the
> best I can to get rid of whatever is near the nerve itself. In no way did I guarantee
> that this surgery is a panacea. I drew out the proposed incision. I met the father
> today and everything was discussed in frank layman terms. The patient saw me 24
> hours prior to the surgery in my office and we went over all these same things. The
> father was present for that discussion also. *Finally, I made it clear to this patient*

> *that when he returns to work he probably will have some residual pain and discomfort that he will just have to endure.*

(R. 555-59 (emphasis added).)  Dr. Kovatis completed an undated Medical Examination By Personal Or Treating Physician Report in support of Plaintiff's application for disability retirement.  Dr. Kovatis noted that Plaintiff required an ankle brace and was no longer able to perform his previous job duties due to ankle weakness and an inability to run, jump, restrain, and climb.  (R. 307-08.)[8]

In December 2008, Dr. Cozzarelli completed a Medical Examination By Personal Or Treating Physician Report in support of Plaintiff's application for disability retirement.  Dr. Cozzarelli noted that Plaintiff must wear a compression stocking for edema/swelling and a lace-up ankle brace.  (R. 305-06.)[9]

In July 2010, bilateral foot and lower leg x-rays ordered by Dr. DeMayo revealed:  bilateral mild degenerative changes of the first metatarsal phalangeal joint and talonavicular joint with normal bone density and status post-hallux valgus correction surgery; and bilateral unremarkable radiographs of the tibia and fibula.  (R. 314-15.)

In August 2010, Plaintiff was evaluated for the first time by Dr. John Vaccaro (neurologist). In a letter to Dr. DeMayo dated August 12, 2010, Dr. Vaccaro noted that physical findings included no true numbness in the feet; normal motor strength in lower extremities except for mild weakness at the left extensor hallucis longus muscle; and normal pinprick, vibration, and joint position testing.  Dr. Vaccaro also noted that Plaintiff's prior venous doppler test was negative and prior arterial doppler test was normal.  Dr. Vaccaro advised that Plaintiff would be evaluated for

---

[8] Dr. Kovatis also submitted treatment records for the period between January and March 2008.  (R. 265-73, 553-54.)

[9] Dr. James Amato (cardiologist) submitted treatment records for the period between December 2009 and July 2011.  (R. 277-84.)

neuropathy and RSD. An EMG study dated August 13, 2010 revealed a left superficial peroneal neuropathy that was probably related to Plaintiff's prior surgeries and accounted for some numbness but not all of Plaintiff's symptoms. There was no widespread nerve damage and no evidence of a peripheral neuropathy or lumbosacral radiculopathy. Dr. Vaccaro prescribed Neurontin for RSD. (R. 450-54.) In February 2011, a three-phase bone scan ordered by Dr. Vaccaro revealed no scintigraphic evidence of RSD but did reveal hyperemia within the right calf on the immediate and blood pool stages. (R. 455-56.)

On September 20, 2011, Dr. Cozzarelli drafted a letter to an unknown recipient opining that Plaintiff had: hallux limitus from his 1994 surgery; progressive worsening in his left foot over the next fourteen years from occupational work, secondary to the presence of four metallic foreign bodies; very unstable balance following his 2008 surgery to repair his ankle and remove the metallic pieces; and RSD of both feet. Dr. Cozzarelli also opined that procedures such as cortisone injections, platelet right plasma, and physical therapy would have minimal positive effects. The only definitive treatment would be a total joint implant of the first metatarsal phalange joint and radio frequency nerve ablation of both feet followed by a course of physical therapy to help establish increased joint range of motion. (R. 433-34.)

In November and December 2011, Dr. Vaccaro saw Plaintiff for follow-up visits; the treatment notes are illegible. (R. 457.) In January 2012, Dr. Vaccaro completed a Reflex Sympathetic Dystrophy (RSD) Medical Assessment advising that Plaintiff suffered from severe chronic pain/paresthesia in his feet. Objective signs of Plaintiff's RSD included: trophic skin changes; vasomotrix instability; swelling; spasm; muscle weakness; impaired sleep; impaired appetite; sensory changes; and chronic fatigue. Plaintiff had significant limited range of motion in his left ankle and both feet. Plaintiff occasionally experienced symptoms that interfered with

the attention and concentration needed to perform simple tasks during a typical workday, and his medications caused drowsiness and reduced concentration. Plaintiff could walk 1 or 2 blocks; could sit for 2 hours and stand/walk for less than 2 hours during an eight-hour work day with need for three unscheduled breaks due to pain/paresthesia and numbness. Plaintiff's legs should be elevated 5 feet during prolonged sitting – and specifically for 80% of an eight-hour workday in a sedentary job – due to edema, pain/paresthesia and numbness. Plaintiff could frequently lift 10 pounds and occasionally lift 20 pounds, and he could occasionally twist or bend. Plaintiff would be absent from work more than 4 days a month due to his RSD. (R. 385-90.)

In February 2012, Dr. Cozzarelli completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) opining that Plaintiff "qualifies for Social Security disability benefits." Dr. Cozzarelli specifically opined that Plaintiff: could occasionally lift/carry up to, but never more than, 10 pounds; could not walk 1 block at a reasonable pace on rough or uneven surfaces; could stand or walk for 15 minutes without interruption for a total of 1 hour each in an 8-hour workday; could sit for 2 hours without interruption for a total of 3 hours in an 8-hour workday; needed to elevate his leg, take his medication, and use his TENS and Paraffin units during the remaining hours of an 8-hour workday; could frequently reach, occasionally handle/finger/feel with his fingers and hands, but never push/pull with his arms; could occasionally operate foot controls, climb stairs/ramps, or stoop; could never climb ladders/scaffolds, balance, kneel, crouch, or crawl; could occasionally operate a motor vehicle or tolerate exposure to humidity and wetness; and could never tolerate exposure to unprotected heights, moving mechanical parts, dusts, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations. Dr. Cozzarelli noted that Plaintiff had RSD of both feet and persistent chronic left

16

ankle instability with minimum range of motion of the first metatarsal phalange joint bilateral. (R. 409-14.)

In May 2012, Plaintiff was evaluated by a physical therapist from Dr. Cozzarelli's office whose physical findings included no tenderness on bilateral first metatarsal phalange joint, heel, and arch; sensory intact on all limbs as to light touch and deep pressure except for increased sensation on bilateral first metatarsal phalange joint as to light touch by 25%; bilateral range of motion within normal limits except for ankles; and altered gait sequence and gait pattern causing gait difficulty. Plaintiff stated that he was independent in all aspects of daily living activities but had limited tolerance to standing (needing to shift weight every 5 minutes), walking (limited to 15-30 minutes without interruption), and ascending/descending stairs. Plaintiff also stated that he experienced intermittent dull pain when stepping on the pedals while driving. Plaintiff was scheduled for physical therapy 3 times per week for 4 weeks. Plaintiff was also prescribed microvascular electric stimulation to increase local circulation and help decrease pain on the ankle and foot. (R. 432, 436-38.)

In July 2012, Dr. Cozzarelli completed a General Medical Report opining that Plaintiff: could occasionally carry up to, and never more than, 10 pounds; could stand and/or walk less than 2 hours per day; could sit less than 6 hours per day; and could never push/pull, including hand and foot controls. (R. 429-32.) Although Dr. Cozzarelli indicated that he had treated Plaintiff on a monthly basis since January 2005, the only treatment records submitted were from Plaintiff's most recent visit in May 2012.

In an unaddressed letter dated August 23, 2012, Dr. Simon Bud Feder (psychologist) – who has treated Plaintiff since January 2012 – summarized Plaintiff's complaints and medical history. Dr. Feder's "evaluative impression is of an anxious and depressed and often very angry person

who at times expresses suicidal ideation, though only in a conditional way (that is, he has no immediate plans of committing suicide but reserves the option for doing so if he doesn't obtain sufficient relief from his physical and emotional pain." Plaintiff's GAF was assessed at 45. (R. 538-39.)

In October 2012, Dr. Vaccaro prescribed an increased dosage of Neurontin for RSD after Plaintiff's physical examination findings included diminished motor strength on the left extensor hallucis longus muscle, decreased pinprick sensation in his feet, and an antalgic gait. (R. 446-47.)[10]

In December 2012, Dr. Feder completed a Social Security Disability Psychiatric Report that repeatedly referenced "my submitted reports." He opined that Plaintiff's physical and mental impairments caused unspecified limitations with understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Dr. Feder also opined that Plaintiff's ability to do work-related activities was limited by his medical conditions and associated medications. (R. 461-66.)[11]

In an unaddressed letter dated September 9, 2013, Dr. Feder advised that Plaintiff "has benefitted from our therapy session and is consequently doing better" and "never took the medication Lexapro which, on Jan. 2, 2013, Dr. DeMayo prescribed for him for depression, because he felt that the therapy session met his needs in that regard, rendering the medication

---

[10] Dr. Brian Cole (orthopedist) submitted treatment records for the period between October 2011 and December 2012. (R. 285, 391-92, 439-43, 472-78.) Plaintiff was diagnosed with lumbar facet disease and prescribed physical therapy. It was noted that Plaintiff's RSD affected his gait pattern, which could contribute to his low back pain.

[11] Dr. Feder also submitted: treatment records for the period between January and December 2012 (R. 485-531); a Functional Limitation Questionnaire dated February 16, 2012 (R. 545); a PTSD Questionnaire dated February 16, 2012 (R. 542-44); and an Anxiety Related Disorders Questionnaire dated February 16, 2012 (R. 540-41).

unnecessary." Dr. Feder opined that "[t]here is no indication that [Plaintiff's] emotional condition stems from an organic mental disorder." Rather, Dr. Feder's diagnostic findings "are strictly due to the debilitating effects of [Plaintiff's] constant pain and suffering from his medical condition, the severe limitation of his life's activities, and the loss of his ability to engage in his profession, one which he highly values." (R. 537.)

On November 4, 2013, Dr. Vaccaro prepared a written note clarifying that his responses on the RSD Medical Assessment should have specified that Plaintiff's legs must be elevated above his heart. (R. 584.)

In an unaddressed letter dated November 12, 2013, Dr. Feder opined that "there is no evidence that [Plaintiff's] movement difficulties and painful sensations and restrictions of living are somatoform or of nonorganic origin[.]" Dr. Feder also opined that "there is however clear evidence of psychological disorders stemming from his medical issues, namely depression, and anxiety and obsessiveness, which is why he is in psychotherapeutic treatment with me." (R. 585.)

### 2.    Non-Treating Providers.

In March 2012, Plaintiff was evaluated by consultative examiner Dr. Solomon Miskin (psychiatrist). (R. 560-62.) Dr. Miskin diagnosed Plaintiff with major depressive disorder, chronic, moderate severity, without psychotic features, not otherwise specified. Plaintiff's GAF assessment was 60. Dr. Miskin observed:

> The claimant presents as a neatly dressed and adequately groomed male, who is alert and oriented in all spheres. He is cooperative, coherent, and compliant. Speech is clear. Response time is good. Comprehension is good. Affect is appropriate. Mood is mildly apprehensive and mildly dysphoric. Sensorium is clear. There is no overt evidence of a thought disorder. Recent memory shows the claimant is able to recall that he did not have breakfast and he had pancakes for dinner in the night prior to the examination. Calculation shows the claimant is able to multiple 6x6 and 6x8 and able to handle everyday addition and subtraction. Abstract ability shows the claimant is responding appropriately to "don't cry over spilled milk." Insight shows the claimant acknowledging periods of dejection.

> Judgment shows the claimant finding a sealed, stamped, addressed envelope in the street and pacing into a mailbox. Concentration shows the claimant is able to spell the word "world" backwards. Attention span shows the claimant is able to repeat 5 digits forward and 5 digits backward. Working memory shows the claimant is able to manager serial 3's subtraction. The claimant is able to follow a 3-step command and is able to recall 3/3 items at 1 minute and 3 minutes. Fund of information shows the claimant aware that "Obama" is the President. The claimant's level of persistence is satisfactory. His intelligence is average.

(R. 561-62.) Plaintiff complains that the examination lasted 15 minutes. He alleges that he was never asked "to do any type of math;" does not know what is meant by Dr. Miskin's "spilled milk" and "envelope" comments; and was never "asked to spell words or repeat digits forward and backward or any commands." (R. 561-62.)

Also in March 2012, Plaintiff was evaluated by consultative examiner Dr. Richard Mills (neurologist). (R. 563-66.) Dr. Mills' report begins with a summary of Plaintiff's self-described medical history. Dr. Mills noted that Plaintiff was "wearing an Ace wrap around both ankles" and was able to ascend/descend the exam table unassisted. As to physical findings, Dr. Mills observed:

> [Plaintiff] is awake and alert. Sensation is intact to pinprick and light touch except patient will not allow anyone to touch the dorsum of his foot. He will not even touch himself, as it will cause pain shooting up his legs. In the bottom of his feet, he has dysesthesias to light touch and also to pinprick, both of these are reduced and the pinprick caused pain out of proportion to the stimulus. In other areas, he is intact. His reflexes were 2+ except he refused ankle jerk testing, as it would be painful. Motor strength is 5/5 except I am unable to test ankle dorsiflexion because the patient will not allow the dorsum of his feet to be tested and touched; however, the patient can walk on his heels. He was not able to walk on his toes. Range of motion is intact except as follows: Right hip forward flexion is 90 degrees, cervical spine lateral flexion 30 degrees bilaterally, rotation 50 degrees right and 60 degrees left, flexion 40 degrees, and extension 50 degrees. He can fully extend his hands, he can make fists, and he can oppose all digits. His grip and pinch strength is 5/5. He separates papers appropriately. Lumbar flexion is 60 degrees. Supine straight leg raises 30 degrees on the right and 40 degrees, on the left with the endpoint of low back pain; however, in the seated posture it is 90 degrees bilaterally. He is able to squat, walk on his heels, and he cannot walk on his toes. He does not walk at a reasonable pace. He has a slow bilaterally antalgic gait. He is not using a handheld assistance device. He states that his father does the food shopping and does most of the clothes washing because he is not able to help with those activities.

(R. 564.)  Dr. Mills' impression was "[h]istory and physical as noted above."  Plaintiff notes that the examination lasted 29 minutes.  He alleges that he was wearing a brace on his left ankle; was assisted by Dr. Mills in ascending/descending the exam table; was never pinpricked; and needed to "hold the wall" both to walk on his heels and squat.  (R. 564.)  Dr. Mills did not discuss the x-rays that he had ordered of Plaintiff's feet and ankles.  According to an x-ray report dated March 14, 2012, Plaintiff's right ankle was intact with no fracture or dislocation.  There is no mention of Plaintiff's left ankle.  Both of Plaintiff's feet exhibited:  hallux valgus deformity with prior osteotomies involving the first metatarsal head; anatomic alignment with smooth bony margins; and no acute fracture or destructive bone lesion.  (R. 567-68.)

### 3.    Non-Examining Providers.

In June 2012, State Agency reviewing consultants initially opined that Plaintiff was capable of "narrow" light work.  He could frequently lift up to 10 pounds and occasionally lift up to 20 pounds; could stand or walk for a total of 3 hours in an 8-hour day; could sit with normal breaks for a total of 6 hours in an 8-hour day; and was limited in both lower extremities as to pushing and pulling.  He could frequently balance, stoop, and kneel; occasionally climb ramps/stairs, crouch, and crawl; and never climb ladders, ropes, or scaffolds.  (R. 108-24.)

On reconsideration in December 2012, State Agency reviewing consultants mostly concurred with the initial opinion.  However, Plaintiff was also limited to following simple instructions; attending, concentrating, and keeping adequate pace and persistence for at least 2-hour segments; and relating and adapting to routine tasks in a work situation.  (R. 126-44.)

### B.    Not Submitted To The ALJ.

On July 6, 2015, the Appeals Council denied Plaintiff's request for review of the ALJ's decision and explained:

In looking at your case, we considered the additional evidence listed on the enclosed Order of Appeals Council with the entire record. We also considered whether the Administrative Law Judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record. We concluded that the additional evidence does not provide a basis for changing the Administrative Law Judge's decision.

With your request for review, your representative alleged that "It seems by the tone of his Decision the ALJ has unfair prejudice against my client." We considered your allegations solely as they relate to your case under the abuse of discretion standard in 20 CFR 416.1470. After reviewing the entire record, including the hearing recording, we have determined that there was no abuse of discretion and that no other basis exists to grant review in this case. We have completed our action on your request for review.

(R. 9.) The referenced Order (R. 12) indicates that the following evidence was added to the record, respectively, as Exhibits 40F and 41F: an undated letter addressed "To Whom It May Concern" from Dr. DeMayo file-stamped June 23, 2014 (R. 586); and a letter addressed to the Appeals Council from Dr. Vaccaro dated July 9, 2014 (R. 587).

## V.     RELEVANT NON-MEDICAL EVIDENCE

### A.     <u>Disability And Function Reports.</u>

In an initial Disability Report (undated and completed by counsel), Plaintiff advised that he was unable to work because of the following impairments: RSD stemming from trauma to both feet; chronic instability in his left ankle status post-surgery; spinal disorder requiring daily medications; uncontrolled hypertension; anxiety; adjustment disorder; and gastroesophageal reflux disease.

In a Function Report dated January 5, 2012, Plaintiff advised that he was selling his home and lived with his father 90% of the time. On most days, he elevated his feet and kept his feet/legs warm. He watched television or read the newspaper on days his vision was not blurry. Plaintiff used TENS and Paraffin units on his feet daily to help with pain and coldness. He used to work, walk, hunt, and go out friends but could no longer do so because of his impairments. Pain and

coldness kept him up at night most of the time.  As to personal care activities, Plaintiff shaved once a week and required a shower seat when bathing because he could not stand for long periods. He used a weekly pill box and wrote himself reminder notes because medications made him forgetful and confused.  Plaintiff's father did all the cooking; a landscaper did all the yard work; and Plaintiff did the laundry once a week for 1 hour.  Plaintiff talked on the phone daily but went out only for doctor appointments, except for rare days (once every 2 weeks) when he went to the grocery store for half an hour.  He was able to drive himself.  Plaintiff could manage his finances when his vision was not blurry.  He needed a calendar book to remind him of doctor appointments. He had no problems getting along with others but could not do anything socially because of chronic pain.  Plaintiff experienced limitations lifting, walking, stair climbing, squatting, sitting, seeing, bending, standing, and with memory and concentration.  The distance he could walk before needing to rest depended on the day.  Medications clouded Plaintiff's memory.  He poorly handled stress and changes in routine, and he experienced panic attacks.  Plaintiff used a brace prescribed in 2008 as needed for support after his ankle surgery.  (R. 195-202.)

In a Third-Party Function Report dated January 3, 2012, Nick Aromando (Plaintiff's father) advised that he lived with Plaintiff.  Plaintiff had constant pain in his feet and lower back that made him unable to walk.  Plaintiff was lethargic and always tired and resting.  Plaintiff's daily activities consisted of laying down because of his pain and medication.  Mr. Aromando indicated that Plaintiff's impairments kept him from engaging in previous activities such as working, running, and hunting.  Plaintiff would wake up during the night because of pain.  As to personal care, Plaintiff was unable to stand for long periods and needed to dress himself slowly, used a shower seat to bathe, and shaved once per week.  Mr. Aromando did all the cooking; a landscaper did the yard work; and Plaintiff did his own laundry.  Plaintiff went outside only as necessary but was able

to drive himself.  Mr. Aromando did not know if Plaintiff did any shopping.  Plaintiff's hobbies included watching television daily.  Mr. Aromando did not know if Plaintiff spent time with others on the phone or computer but noted that Plaintiff did not go out socially.  Plaintiff experienced limitations walking, stair climbing, sitting, seeing, bending, standing, and with memory/concentration.  However, Mr. Aromando did not know the specifics of these limitations.  Plaintiff's ability to follow written and spoken instructions was fair, and he did not handle stress well.  Mr. Aromando did not know how Plaintiff handled changes in routine but noticed that Plaintiff suffered anxiety attacks.  Plaintiff used a brace/splint when needed; Mr. Aromando did not know if this aid was prescribed by a doctor.  Finally, Mr. Aromando advised that he was "not allowed to ask" Plaintiff about medications but did know that Plaintiff took "many of them."  (R. 187-94.)

In a Disability Report dated June 7, 2012, Plaintiff advised that his RSD pain and all of his other conditions had worsened since April 5, 2012.  He was "[i]n bed laying down a lot more;" he was diagnosed with depression and PTSD in February 2012; it was "[m]uch more difficult" for him to care for his personal needs because he had "less mobility and spen[t] more time laying (sic) in bed;" and he had "less mobility" in his daily activities.  (R. 224-30.)

In a Disability Report dated January 16, 2013, Plaintiff advised that there were no changes since the last Report in his illnesses, injuries, conditions, physical/mental limitations, ability to care for his personal needs, or daily activities.  (R. 231-37.)

B.    **Plaintiff's Hearing Testimony.**

Plaintiff was questioned by his counsel and the ALJ during the hearing on October 31, 2013.  (R. 56-103.)  The Court summarizes Plaintiff's testimony as follows:

Plaintiff's impairments caused him to stop working on April 1, 2009 after 15 years as a Corrections Officer for the Bergen County Jail. He was injured on the job in 1994, 2004, and 2007. Plaintiff filed a workers' compensation claim for his 2007 left ankle injury and was initially advised by his "workers' comp doctors" that he did not need surgery. Dr. Cozzarelli and Dr. Kovatis disagreed, and Dr. Kovatis performed surgery in 2008 to repair Plaintiff's left ankle and remove metallic pieces that remained inside Plaintiff's left foot from his 1994 bunionectomy. Plaintiff wore a cast up to his left knee for 5-6 weeks after the 2008 surgery. After the cast was removed, Plaintiff wore a compression stocking that went up to his left calf during eight months of physical therapy. The stocking was recommended by his physical therapist because of swelling issues. Plaintiff's RSD made it painful for him to put on the stocking, but he wanted to comply with recommendation. When Plaintiff's RSD was diagnosed in 2001, it was limited to his feet; later, the condition traveled and extended below the knees. As a result, Plaintiff lost hair on his calves and experienced constant pain and coldness in his feet. After his 2008 surgery, he was cleared to return only for sedentary work with his legs elevated. Plaintiff referred to this as "light duty work" in which he made telephone calls involving pending warrants. He called in sick at least once or twice a week because of pain and alleged that he was repeatedly mocked and harassed at work because of his condition. After he retired on disability, Plaintiff sued his former employer about the alleged harassment and settled the case for $30,000.

After his 1994 surgery, Plaintiff was prescribed an ankle brace to assist with walking because of ankle instability, but wearing the brace exacerbated pain caused by RSD and swelling. Dr. Cole prescribed a TENS unit in June 2012 for Plaintiff's lower back. Dr. Cozzarelli prescribed a TENS unit 4-5 years ago for Plaintiff's feet. Plaintiff used the unit twice daily for 20-minute cycles on each foot. He also used a Paraffin unit every night at least 4 times per week (and every

night during the winter) for 40-minute cycles on each foot. These devices provided temporary relief for 30-60 minutes. Plaintiff elevated his legs most of the day by laying back in a recliner or using two pillows under each leg while in bed or on the couch. He used an electric blanket on his feet daily.

Plaintiff lived with his father, who did all housework except for Plaintiff's minimal laundry. Plaintiff did not drive often and left home only for medical appointments and errands. He testified that he would not be able to drive if the symptoms he experienced on his left leg were present on his right leg. His bedroom was on the first floor and he avoided stairs, which required him to move sideways and grasp a handrail. Plaintiff used a lumbar pillow during the hearing as recommended by Dr. Cole. He could sit for about 30 minutes without interruption before experiencing pain; walk about a quarter of a block before needing to stop and rest; and stand for 20 minutes before needing to lean on something or sit for 30 minutes. He shaved once per week; it took him 40 minutes, during which he stood for 20 minutes and sat on a stool for 20 minutes. He used a shower chair. Plaintiff watched a lot of television and characterized a laptop and Facebook as his only social life. His hunter's license has not been renewed since the early 2000s because he can no longer hunt. Plaintiff experienced anxiety for several years; the anxiety worsened as his medical conditions worsened. He had panic attacks from pain and PTSD nightmares from the alleged harassment at work.

Plaintiff saw Dr. Feder weekly and Dr. Cozzarelli every 8 months for painful cortisone shots that provided temporary relief. Plaintiff took 11 medications, including: Lipitor (cholesterol); Lasix, Norvasc, and Inspra (blood pressure); Nexium (acid reflux); Allopurinol (uric acid); Mobic (inflammation): Tylenol with Codeine and Neurontin (RSD/pain); and Xanax (anxiety). The medications made him drowsy and forgetful, but they provided temporary relief.

Drs. Amato and DeMayo were concerned about the impact of Plaintiff's medications on his liver function but concluded that none of the prescriptions could be eliminated. Plaintiff experienced 4-5 "good" days per month but testified that "even if I feel better, I don't say well this is the day I'm going to go to the mall because I don't go to the mall. I can't walk. It just feels better but it's not like I go out and do cartwheels. It just feels a little bit better." (R. 96.) Dr. Cozzarelli recommended another surgery to replace Plaintiff's toe joints because he has no cartilage left on either foot. Dr. Vaccaro expressed concern that Plaintiff's RSD could travel even further up his legs following another surgery.

## V.    DISCUSSION

### A.    <u>Scope Of Evidence.</u>

"No statutory provision authorizes the district court to make a decision on the substantial evidence standard based on new and material evidence never presented to the ALJ." *Matthews v. Apfel*, 239 F.3d 589, 594 (3d Cir. 2001). "The correctness of [the ALJ's] decision depends on the evidence that was before him. He cannot be faulted for having failed to weigh evidence never presented to him." *Id.* at 592; *see Miller v. Comm'r Soc. Sec.*, 732 F. App'x 162, 165 (3d Cir. 2018) ("[A] district court 'cannot look to evidence never presented to the ALJ in determining whether that decision was supported by substantial evidence[.]'") (quotation omitted). The Court therefore finds that it cannot consider when reviewing the ALJ's decision the two letters submitted directly to the Appeals Council by Plaintiff's treating providers (i.e., Exhibits 40 and 41). The Court also finds that Plaintiff has waived any request for remand under Sentence Six of 42 U.S.C. § 405(g) as to the two letters. *See Miller*, 732 F. App'x at 164-65 (by failing to seek Sentence Six remand from district court, "[claimant] waived the opportunity for her benefits ruling to be reviewed in light of the new evidence").

Moreover, the Court finds that, even if timely asserted and adequately briefed, a Sentence Six remand request would be futile. *See Szubak v. Secr. of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984) (to justify Sentence Six remand, claimant must demonstrate that additional evidence is new and material, and that good cause exists for failing to present the evidence prior to ALJ decision). The letters from Drs. DeMayo and Vaccaro summarily express disagreement with the ALJ's decision, reiterate the doctors' shared belief that Plaintiff is permanently disabled, and urge the Commissioner to reverse the decision based on the existing record before the ALJ. Accordingly, the letters are neither new nor material. *See id.* (additional evidence that is "merely cumulative of what is already in the record" is not "new"); *Miller*, 732 F. App'x at 165-66 (additional evidence is "material" if there is "a reasonable probability that the new evidence would have changed the outcome of the Commissioner's decision").[12]

**B.**     **Step Four:  RFC Finding.**

The ALJ found at Step Four that:

> [T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he is limited to jobs which are simple and repetitive that do not involve working in a cold environment. He needs to be able to elevate his feet.

(R. 37.) Plaintiff argues that the RFC finding was not supported by substantial evidence because the ALJ:  (1) erroneously weighed the treating opinion evidence; and (2) erroneously assessed Plaintiff's subjective symptoms.

---

[12] The Court need not decide how the third requirement for a Sentence Six remand – demonstration of good cause for failure to present additional evidence prior to the decision date – would apply to letters prepared by claimant's treating physicians for the sole purpose of critiquing the ALJ's decision.

### 1.    Medical Opinions.

The Court first addresses an issue not raised by either party – namely, the non-examining opinions provided by the State Agency consultants during their initial and reconsideration reviews of Plaintiff's DIB application.  These opinions "must" be considered in the ALJ's sequential analysis.  *See* 20 C.F.R. § 404.1513a(b)(1) (noting that State Agency medical or psychological consultants "are highly qualified and experts in Social Security disability evaluation").  The Court is unable to conduct a meaningful review of the ALJ's assessment of these evidentiary sources because the ALJ's decision failed to mention, let alone ascribe any weight to, their opinions.  This is reversible error.

The Court next turns to Plaintiff's argument that the ALJ made a reversible error by ascribing "little weight" to the opinions of Plaintiff's treating providers.  (R. 40.)  A treating opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("[A]n ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.").  This deference applies to opinions that reflect judgments about the nature and severity of a claimant's impairments, including the claimant's symptoms, diagnosis, and prognosis; what s/he can still do despite the impairments and his/her physical or mental restrictions.  20 CFR § 404.1527(a).  An "opinion" that a claimant is simply unable to work can never be given controlling weight because that is an administrative finding reserved to the Commissioner.  20 CFR § 404.1527(d).  When a treating opinion cannot be given controlling weight, it still may be entitled to some deference based on the

ALJ's consideration of the following factors, which the ALJ must also consider as to non-treating and non-examining opinions: length of treatment relationship, frequency of examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source. 20 C.F.R. § 404.1527(c)(2)-(6); *see Plummer*, 186 F.3d at 429 (ALJ "may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided").

The ALJ ascribed little weight to Dr. Feder's opinion. Plaintiff did not seek any psychiatric treatment until January 2012 after filing his disability claim. Plaintiff reported that he was doing so well by September 2013 that no depression medication was necessary. The general limitations opined by Dr. Feder as to Plaintiff's understanding, memory, concentration, and persistence were accommodated by the RFC limitation to simple and repetitive jobs. Having never physically examined Plaintiff, Dr. Feder could not (and did not) identify any functional limitations resulting from Plaintiff's physical impairments. The Court finds that the ALJ's assessment of Dr. Feder's opinion was supported by substantial evidence.

The ALJ also ascribed little weight to the treating opinions of Drs. DeMayo, Cozzarelli, and Vaccaro after finding that they were not supported by the record. The ALJ concluded that these opinions were:

> inconsistent with the laboratory evidence showing minimal pathology, the noted exaggeration of symptoms upon examination, the fact that the claimant's doctors told him to stop taking medication and his own report that he felt better with therapy. The doctors opined that the claimant cannot sit for long periods even though the surgery was on the claimant's feet. The claimant's treatment has consist[ed] of surgery six years ago, some medication and a short course of physical therapy. No additional surgery has been recommended because there is nothing showing on multiple MRIs which would support his complaints. It is of note that despite holding out that he cannot walk, he holds a current hunter's license and he admitted that he can drive locally.

(R. 40.)  As discussed below, the ALJ's conclusion did not consider the entire record, failed to resolve evidentiary conflicts, and relied on his own lay opinion.

The gravamen of Plaintiff's DIB application is his RSD impairment.  Plaintiff's symptoms, worse on the left side, have troubled him since his 1994 bunionectomies.  Dr. Brand opined in 2001 that Plaintiff's symptoms were consistent with an RSD diagnosis for which no "specific therapeutic modality" existed.  Dr. Brand opined in March 2004 based on physical findings that Plaintiff's RSD had progressed.  An MRI report confirmed in 2005 that metal fragments from Plaintiff's 1994 surgery remained in his left foot.  Dr. Kovatis opined in 2008 that Plaintiff would continue to experience pain even if the fragments were removed during surgery to repair a separate left ankle injury (which separately caused Plaintiff to experience instability and limited range of motion).  Dr. Vaccaro prescribed Neurontin in 2010 after an EMG study revealed a left superficial peroneal neuropathy that accounted for some of Plaintiff's symptoms.  Dr. Cozzarelli opined in 2011 that the only definitive treatment for Plaintiff's symptoms would be a total implant of the first metatarsal phalange joint.  Dr. Vaccaro was concerned that the recommended implant surgery could exacerbate Plaintiff's RSD.  Dr. Vaccaro increased Plaintiff's Neurontin dosage in October 2012 based on physical examination findings that included diminished motor strength on the left extensor hallucis longus muscle, decreased pinprick sensation in his feet, and an antalgic gait.  The ALJ's decision did not discuss any of this evidence.

Moreover, the Court is confused by the ALJ's suggestion that Plaintiff should have no limitations with sitting because his two surgeries involved his feet.  Plaintiff testified, and his treating physicians opined, that the RSD caused pain, numbness, and coldness in his feet that extended to below his knees unless elevated.  The Court is also confused by the ALJ's statement that "[t]here is nothing in the evidence nor is there anything in the credible evidence that I heard

31

at the hearing that would justify that the claimant had to continually elevate his leg as opposed to just using an elastic stocking." (R. 40.) Neither the ALJ nor this Court has the medical expertise to reach that conclusion. Drs. DeMayo, Cozzarelli, and Vaccaro each opined that Plaintiff was required to elevate his leg and to keep it warm. In response to questioning during the hearing, Dr. Vaccaro timely submitted a written clarification that Plaintiff needed to elevate his leg above heart level. The RFC finding omitted this clarification. The RFC finding also does not include that Plaintiff required an electric blanket and/or a Paraffin unit, that Plaintiff was prescribed and wore a lace-up ankle brace for better stability when standing, or any of the additional exertional and postural limitations opined by Plaintiff's treating providers. The ALJ's decision provides no explanation for these exclusions.

Further, the Court is troubled by the ALJ's inaccurate descriptions of Plaintiff's hearing testimony. Plaintiff did not testify that he holds a current hunter's license. Plaintiff testified that he did not renew his hunting license because he had not been able to hunt for over a decade. Plaintiff's testimony regarding his driving ability is not inconsistent with the treating opinions that he cannot sit for six hours in an eight-hour workday. Plaintiff testified that he drives only to/from medical appointments and pharmacies, and there is no evidence that such travel involves long-distances requiring prolonged periods of sitting. Plaintiff additionally testified that he could not use his left foot at all to drive because of pain. Plaintiff did not testify that he rejected his physicians' advice to reduce his medications, which were beginning to have an adverse effect on his liver function. Plaintiff testified that Dr. DeMayo specifically concluded that none of the medications could be discontinued. Plaintiff did not testify that his physical symptoms were better with therapy. He testified that his depression and anxiety were better with psychological therapy,

and that Neurontin and Tylenol with Codeine offered temporary relief (for an hour or two) for some of his physical symptoms.

The Court therefore finds that remand is warranted for a new RFC finding at Step Four because the ALJ's assessments of the treating opinions of Drs. DeMayo, Cozzarelli, and Vaccaro were not supported by substantial evidence.

## 2.    Plaintiff's Subjective Symptoms.

"Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. *See* 20 C.F.R. § 416.929. First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms. Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms. To do this, the ALJ must determine if objective medical evidence alone supports the claimant's complaints; if not, the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI:  Evaluation of Symptoms in Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[13]

The ALJ's decision summarized Plaintiff's testimony from the October 31, 2013 hearing. (R. 38.)   After noting that Plaintiff's symptoms were considered in accordance with the requirements of SSR 96-7p, the ALJ recited the two-step standard above and concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision."  (R. 38, 40.)  Plaintiff argues that this assessment misstated both the medical evidence and his testimony.  The Court agrees.  As noted above, the ALJ's decision did not properly address the evidentiary medical record and misstated Plaintiff's testimony as to his hunting license, driving ability, medication intake, and therapy/treatment results.  Plaintiff also did not testify that "it takes him *12 hours* to shave."  (R. 38 (emphasis in original).)  He testified that it takes him 40 minutes, during which he stands for 20 minutes and sits on a stool for 20 minutes.  Nor did Plaintiff fail to give "a coherent answer" to the ALJ's question "how he could have possibly worn an elastic stocking for 8 months with RSD." (R. 38.)  Plaintiff testified it was recommended he wear an elastic stocking during physical therapy after the 2008 surgery to help with edema/inflammation.  Plaintiff further testified that it was very painful for him to wear the stocking, but he did it to comply with medical orders.  The Court cannot

---

[13] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made prior to March 28, 2016.

meaningfully review the ALJ's credibility assessment because it is unclear how much of that assessment rested on the ALJ's misstatements.

The Court therefore finds that remand is warranted for a new RFC finding at Step Four because the ALJ's assessment of Plaintiff's subjective symptoms was not supported by substantial evidence.

### 3.    Lay Testimony.

Although not raised by the parties, the Court additionally finds that the ALJ erred with respect to the Third Party Function Report submitted by Plaintiff's father.  The Third Circuit instructs that an ALJ is free to "discount" lay witness testimony but must explain the reasons for doing so, even when such testimony mirrors the claimant's testimony.  *Fargnoli*, 247 F.3d at 43; *see Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983) (ALJ must evaluate credibility of and ascribe weight to lay testimony); *Burnett*, 220 F.3d at 122 (duplicative lay witness testimony can bolster claimant's credibility).  The ALJ's decision did not even acknowledge Mr. Aromando's Report and left the Court to guess if and how the Report was incorporated into the RFC finding and the assessment of Plaintiff's credibility.  The Court finds for this additional reason that remand is warranted because the Court cannot meaningfully review this aspect of the ALJ's decision.  *See Wolk v. Colvin*, No. 2:15-cv-02478 (CCC), 2017 WL 1293015, at *6 (D.N.J. Apr. 5, 2017); *Del Valle v. Comm'r of Soc. Sec.*, No. 12-cv-7930 (RMB), 2014 WL 546111, at *10 (D.N.J. Feb. 10, 2014) (same).

## V.     CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.


Dated:  March 6, 2019                                    _____s/ Paul A. Zoss_____
At Newark, New Jersey                              PAUL A. ZOSS, U.S.M.J.